IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

LEONETTI WILLIAMSON                                              PLAINTIFF

V.                                         CASE NO. 2:20-cv-00199-TBM-RHWR

KILOLO KIJAKAZI,[1]                                              DEFENDANT
*Acting Commissioner of Social*
*Security Administration*

## REPORT AND RECOMMENDATION

Plaintiff Leonetti Williamson seeks judicial review of the decision of the Commissioner of the Social Security Administration, denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d)(1)(A). Plaintiff has filed a Motion for Summary Judgment [20]. Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, has filed a Response [24] and Plaintiff a Rebuttal [25]. Having considered these submissions, the record, and relevant law, the undersigned concludes that the decision of the Administrative Law Judge (ALJ) should be affirmed because it is supported by substantial evidence, and Plaintiff has not shown legal error.

## I. BACKGROUND

Plaintiff is a college graduate who worked as a Medicare specialist for thirteen years. [15] at 22. On July 27, 2018, she filed an application for DIB, alleging disability beginning November 1, 2009, when she was forty years of age, because of multiple

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is automatically substituted as Defendant in this action.

sclerosis, hemiplegic migraines, seizures, depression, and anxiety. *Id.* at 87, 100. After Plaintiff's application for DIB was denied at the initial and reconsideration levels, she requested a hearing before an ALJ, and a hearing was held on November 14, 2019. *Id.* at 39-84. At the hearing, Plaintiff amended her alleged onset date to October 1, 2018, when she was 49 years and 5 months of age. *Id.* at 47. Plaintiff's last day of work was October 1, 2018. *Id.* at 45.

On January 9, 2020, the ALJ issued a decision unfavorable to Plaintiff. *Id.* at 15-31. After the Appeals Council denied Plaintiff's request for review on May 27, 2020, Plaintiff filed this action under 42 U.S.C. § 405(g), which grants the Court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

In making the determination that Plaintiff was not entitled to benefits, the ALJ utilized the five-step evaluation process set forth in 20 C.F.R. § 404.1520. The ALJ determined, sequentially, whether Plaintiff (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526); (4) could perform the requirements of past work; and, if not, (5) based on Plaintiff's age, work experience, and residual functional capacity ("RFC"), could adjust to other work that existed in significant numbers in the national economy.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 1, 2018. [15] at 18. At step two, the ALJ concluded that Plaintiff's "Left shoulder; right hand; lumbar spine; multiple sclerosis; migraine headache, and obesity" were severe impairments. *Id.* The ALJ found that Plaintiff's "dysuria, urinary frequency, glaucoma, speech problems, and history of seizures" were not severe impairments. *Id.* At step three, the ALJ determined that Plaintiff's severe impairments or combination of impairments did not meet or medically equal the requirements of a listed impairment. *Id.*

Before reaching step four, the ALJ assessed Plaintiff's symptoms and limitations, finding that Plaintiff retained the RFC

> to perform light work as defined in 20 C.F.R. § 404.1567(b) except no climbing ladders, ropes, or scaffolds. No use of non-dominant left shoulder for overhead activities. Avoid working at unprotected heights and around moving machinery. No constant use of dominant right hand for manipulation, handling, and holding objects. Avoid temperature extremes, hot or cold. Must avoid concentrated exposure to dust or humidity. Limited to simple routine type work. Is able to interact with others and receive supervision.

*Id.* at 21.

At step four, the ALJ concluded that Plaintiff was unable to perform any past relevant work. *Id.* at 29. At step five, the ALJ posed a hypothetical RFC to the vocational expert that mirrored the resulting RFC. The vocational expert considered a claimant with the same age, education, and past relevant work as Plaintiff, and with the RFC crafted by the ALJ, and concluded that such a claimant could perform the requirements of representative occupations such as office helper, D.O.T. 239.507-010, light, unskilled work (SVP-2), with 157,000 jobs in the national economy;

3

cafeteria attendant, D.O.T. 311.077-010, light, unskilled work (SVP-2), with 20,000 jobs in the national economy; and order caller, D.O.T. 209.007-014, light, unskilled work (SVP-2), with 213,000 jobs in the national economy. *Id.* at 30. The ALJ found Plaintiff was not disabled from October 1, 2018, through January 9, 2020, the date of the ALJ's decision. *Id.* at 30-31.

Plaintiff alleges that the ALJ ignored and misstated the vocational expert's testimony. [21] at 2. Plaintiff argues that the ALJ failed to incorporate all her functional limitations into the RFC because he "erroneously ignored, disregarded, or failed to consider the records, findings, [and] opinions of" neurologist Charles S. Markle, M.D. and urologist Matthew McIntyre M.D. *Id.* at 9. Plaintiff asserts that the ALJ did not "support his finding that Plaintiff's limitation to simple, routine, repetitive tasks has little or no effect on the occupational base." *Id.* at 11. Plaintiff maintains that "this case should at least be remanded for a full, judicious Hearing [sic] before another ALJ" because the ALJ "injudiciously interrupted and cut-off" Plaintiff, Plaintiff's counsel, and the vocational expert throughout the hearing, *Id.* at 4.

Defendant counterargues that the ALJ included limitations in the RFC that he found supported by the whole record and posed a hypothetical to the vocational expert that included those limitations. [24] at 6-9. Defendant asserts that Plaintiff ignores the medical evidence cited by the ALJ that does not support the degree of limitation she alleges. *Id.* at 8. Defendant submits that the ALJ was not injudicious but conducted a hearing that was over an hour long; questioned Plaintiff, her

representative, and a vocational expert; and permitted Plaintiff's representative to question the vocational expert as well." *Id.* at 6 n.2.

## II.  ANALYSIS

### A.  Standard of review

The Court's review of the Commissioner's final decision that Plaintiff was not disabled is limited to two inquiries: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *See* 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means - and means only - such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations and internal quotations and brackets omitted).

In applying the substantial evidence standard, the Court "may not re-weigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). The ALJ has the sole responsibility for determining a claimant's disability status at the hearing level. *See Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). "In doing so,

the ALJ is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly." *Id.* (internal citation omitted).

B.    The ALJ did not ignore or misstate the vocational expert's testimony

Plaintiff argues that the ALJ ignored and misstated the vocational expert's testimony that Plaintiff "wouldn't be able to do these jobs." [15] at 78. The context of this testimony is important and was not presented in Plaintiff's initial Memorandum.

After the ALJ elicited testimony from the vocational expert, he permitted Plaintiff's attorney to question the vocational expert. *Id.* at 69-83. Plaintiff's attorney asked the vocational expert if the hypothetical person's "use of the right hand would have to be reduced to occasional, would these jobs still be available?" *Id.* at 78. The vocational expert responded that "if you can only use your right hand occasionally, you wouldn't be able to do these jobs." *Id.*

The vocational expert's testimony that "if you can only use your right hand occasionally, you wouldn't be able to do these jobs" would be relevant if the ALJ found Plaintiff could only use her right hand occasionally. But the ALJ did not make this finding. The RFC limited Plaintiff to "no constant use of dominant right hand for manipulation, handling, and holding objects." *Id.* at 21. The ALJ included a limitation to "no constant use of dominant right hand for manipulation, handling, and holding objects" in the hypothetical RFC he posed to the vocational expert. The vocational expert considered a claimant with the same age, education, and past relevant work as Plaintiff, and with the same RFC as crafted by the ALJ, and concluded that such

a claimant could perform the requirements of representative occupations such as office helper, cafeteria attendant, and order caller. *Id.* at 66-69.

The ALJ was not required to adopt the vocational expert's testimony that was based on a hypothetical posed by Plaintiff's attorney that the ALJ did not find supported by the whole record. *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir. 1985). The ALJ found the whole record showed Plaintiff had weakness in her right hand. The ALJ considered Dr. Markle's records dated February 1, 2019, reporting, "She's having some hand numbness and tingling. We reviewed her last MRI's done at MI. She's got mild stenosis at L4-5 in back and she's got old MS lesions and no acute lesions. . . . She's had trouble writing with right hand and with concentration." [15] at 27; [16] at 795. The ALJ reviewed a motor exam by Dr. Markle showing Plaintiff's "right handgrip was 4-/5; left handgrip was 4-/5" with level 5 being a normal grip. [15] at 27, 51-52. The ALJ accommodated Plaintiff's weakness in her right hand by limiting her to "no constant use of dominant right hand for manipulation, handling, and holding objects." There is no legal error or reason for reversal based on Plaintiff's contention that the ALJ ignored and misstated the vocational expert's testimony.

C.     The ALJ did not ignore, disregard, or fail to consider the medical evidence

Plaintiff argues that the ALJ failed to incorporate all her functional limitations into the RFC determination because he "erroneously ignored, disregarded, or failed to consider the records, findings, opinions of" neurologist Dr. Markle and urologist Dr. McIntyre. Plaintiff argues that the ALJ erred by omitting from the RFC Plaintiff's "current, severe incontinence . . .frequent urination . . . severe pain . . . severe fatigue

. . . severe seizures . . . severe depression . . . "spine, shoulder, back, legs, R arm and R (<u>dominant</u>) hand weaknesses" . . . and "aggressive multiple sclerosis weakness in R arm." [25] at 2.

Plaintiff's argument amounts to a disagreement with how the ALJ weighed the evidence because the ALJ's decision shows that he evaluated the evidence from Drs. Markle and McIntyre and considered her limitations. The ALJ found Plaintiff suffered from the severe impairments of "[l]eft shoulder; right hand; lumbar spine; multiple sclerosis; migraine headaches; and obesity." [15] at 18. He found Plaintiff's "dysuria, urinary frequency, glaucoma, speech problems; and history of seizures are such slight abnormalities . . . [that] they would not be expected to interfere with her ability to work, irrespective of age, education, or work experience . . . ." *Id.* The ALJ summarized Plaintiff's testimony, medical records, and reports indicating that when she has a "flare up" from multiple sclerosis, it lasts for two to three days, and

> she cannot get out of bed, walk, or talk, or be [sic] a combination of those limitations. There is no timetable as to when she will have a flare up. Her right hand is weaker than her left hand, but they are both weak. Her right side is weaker than her left side. She has fatigue, and is tired a lot, just about every day. . . . She is tired, fatigued, and depressed all the time. She was forgetting things at work . . . She had to reread the regulations when she was determining if someone was eligible. Her arm would fall off the table when she was writing, and she had to get a coworker to help her. They would tell her to take a break. She could not lift her shoulders. She was out of work for three months one time, and then in 2016 she was on medical leave. She has not required hospitalization in the last year. She has had three home infusions but did not have to go to the hospital. Her stress level had an impact on her multiple sclerosis.

*Id.* at 24.

Plaintiff offered the ALJ an October 31, 2019, letter from her treating neurologist Dr. Markle, who opined that Plaintiff was unable to be "gainfully employed at this time because of speech impairment, neurogenic bladder, fatigue, and right hand weakness along with other symptoms she suffers as related to her [relapsing and remitting Multiple Sclerosis]." [17] at 1381. Dr. Markle completed a physical functional assessment form on November 11, 2019. *Id.* at 1409-12. The ALJ found Dr. Markle's opinion "only partially supported by his office notes and not supported by" the consultative examination report of Joseph Leech, D.O., who examined Plaintiff on January 19, 2019. [15] at 28; [17] at 106-08.

The ALJ emphasized that "the most recent office notes from Dr. Markle indicate that [Plaintiff] had some generalized weakness, some mild lumbar stenosis, without active multiple sclerosis lesions" and "the claimant reported to the consultative examiner, Dr. Leech, that her multiple sclerosis was currently asymptomatic on January 19, 2019. *Id.* at 20. The ALJ highlighted that an MRI from May 2019 "showed MS to be stable other than some enhancement in T spine at T 6." [15] at 25, [17] at 1362, 1366.

The ALJ considered the findings of a lumbar spine MRI performed on November 17, 2017, compared to one performed on June 11, 2016. The 2016 lumbar spine MRI "showed a small disc protrusion at L4-5 with annular tear at L4-5. There was no significant stenosis, with no lesions being mentioned." [15] at 25. The 2017 lumbar spine MRI "was unchanged compared to 6/11/2016" and "showed a stable, 'Quite minimal bulging disc material is noted at L4-5." *Id.* The ALJ observed that

9

Dr. Markle's records showed that on November 10, 2017, and August 28, 2018, Plaintiff's gait was normal, and strength was good. *Id* The ALJ noted that Dr. Leech found Plaintiff's motor strength normal. *Id.* at 47; [17] at 107-08.

The ALJ considered a March 2015 left shoulder MRI that showed "[n]o evidence of rotator cuff tear. There is perhaps minimal tendinosis. Glenoid labrum is normal." [15] at 22-23. A July 2016 left shoulder fluoroscopy showed no obvious abnormalities. *Id.* at 23. The ALJ summarized records from Hattiesburg Clinic showing Plaintiff "had normal left shoulder muscle tone, without atrophy, on June 24, 2016 . . . was given a subacromial steroid injection. . . [P]rior MRI was normal. Diagnosis were rotator cuff tendonitis, left shoulder and adhesive capsulitis, left shoulder." *Id.* at 19. The ALJ considered that Plaintiff "made no report of shoulder problems at the consultative examination by Dr. Leech" *Id.*

The ALJ assessed Plaintiff's history of seizures and her report that she on average suffered one dyscognitive seizure a month. *Id.* at 20. The ALJ articulated that "[t]here is relatively little mention in the record about her seizures, other than as past medical history or as a current diagnosis. There are no EEG findings in the record to indicate seizure activity, even in the records from her neurologist. She has not gone to the emergency room because of seizures." *Id.* at 24. The ALJ observed that Plaintiff was not prescribed medication specifically for seizures though she was prescribed Topomax for nerve pain, and Topomax is also used for seizure disorder. *Id.* at 23. The ALJ highlighted that Dr. Leech reported Plaintiff's "seizures are atypical for clonic-tonic seizures or dyscognitive seizures, as she was aware she was

having them and did not have any post-ictal symptoms. Her seizures appear to be refractory to medication, as indicated by her report that she had a seizure after her medication was stopped when she had insurance issues." *Id.* at 20; [17] at 106.

The ALJ reviewed Plaintiff's urinary problems and concluded from the records of Dr. McIntyre that they were nonsevere because Plaintiff's dysuria and urgency were characterized as mild and responsive to Botox injections and Urogesic Blue. [15] at 22. The ALJ considered Plaintiff's headaches which had improved on Topomax, according to her report to Dr. Leech, and now occurred "every now and then." *Id.* at 23; [17] at 106. The ALJ observed that Dr. Markle's treatment records showed that on October 29, 2019, Plaintiff's "headaches were better on Aimovig." [15] at 25.

The ALJ considered neurological issues and concluded that "[s]he does not have any marked difficulties with physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace, or adapting or managing oneself." *Id.* at 20. He emphasized at the hearing that there was "no objective evidence of her having any cognitive impairment." *Id.* at 48. He noted that Wulf Hirschfield, M.D. noticed "she stutters, but her cognition is intact, her speech is clear, she has good tone control." *Id.* at 51. The ALJ pointed to Dr. Markle's findings that her speech and cognition were intact, and her gait was normal. *Id.* at 49; [16] at 795-815.

The ALJ considered Plaintiff's testimony that she was depressed and fatigued and prescribed medication for depression by Dr. Markle. [15] at 59. The ALJ did not find depression or fatigue to be medically determinable impairments. Plaintiff points to

no conflicting, objective medical evidence upon which the ALJ could have found differently. Her mere assertion that accommodations for these limitations should have been included in the RFC is not grounds for relief.

Attached to Plaintiff's brief are various exhibits that are not a part of the 1412-page, certified administrative record. Plaintiff offers a report [21-3] by Samuel Holmes Peeples, M.D. dated June 5, 2018, and a work activity questionnaire [21-2] completed by Plaintiff's former supervisor Laura McClain, dated September 21, 2018. Plaintiff represents that the report and questionnaire "were timely filed with SSA, but lost." [21] at 8. These documents were apparently generated in connection with Plaintiff's claim for disability under Public Employee Retirement Systems of Mississippi. Plaintiff also offers an article from the *International Journal of MS Care* entitled "Social Security Disability Application Experiences of People With Multiple Sclerosis in the United States." [21-5].

The Court does not have the power to change or supplement the official administrative record. Only the Commissioner has the power to certify the record. *See* 42 U.S.C. § 405(g). Remand for the ALJ to consider Plaintiff's exhibits is improper because Plaintiff merely references her exhibits and has not shown that the exhibits are new evidence that is material and that there is good cause for the failure to incorporate such evidence into the certified record. *See id; Kane v. Heckler,* 731 F.2d 1216, 1220 (5th Cir. 1984). Even if the exhibits had been before the ALJ, he would not have been required to articulate his consideration of "[e]vidence that is inherently neither valuable or persuasive," which would include Dr. Peeple's opinion that

"disability is reasonable in her situation." *See* 20 C.F.R. § 404.1520b(c). "Evidence that is inherently neither valuable nor persuasive" includes decisions by other governmental agencies, statements on issues reserved to the Commissioner, statements that "you are or are not disabled," and statements "about whether or not your [RFC] prevents you from doing past relevant work" are not valuable or persuasive. *Id.*

The ALJ understood that Plaintiff's impairments could and do cause work-related limitations, which is reflected in his decision and RFC determination. The ALJ explained at the hearing that he did not see in the medical record "where there are any significant flare-ups that are totally . . . debilitating for a woman of [Plaintiff's] age and education level." [15] at 53. The ALJ crafted a decision that cites appropriately to the medical record and opinions in support of the RFC determination. The ALJ did not find Dr. Markle's opinion on the ultimate issue of disability supported by Dr. Markle's own treatment records, the treatment records of Dr. Hirshfield M.D., the treatment records of Arthur Wood III M.D., and numerous imaging studies. Plaintiff is arguing that the record supports greater functional limitations than found by the ALJ, but the Court may not reweigh the evidence. Substantial evidence supports the ALJ's RFC determination, and the Court is not at liberty, under the law, to change the outcome.

D.    Simple, routine type work

Plaintiff argues that the ALJ did not "support his finding that Plaintiff's limitation to simple, routine, repetitive tasks has little or no effect on the occupational base."

[21] at 11. However, the ALJ did not limit Plaintiff to "simple, routine, and repetitive tasks," as Plaintiff represents repeatedly in her brief. *Id.* at 11, 12, 14.  The ALJ limited Plaintiff to "simple, routine type work." [15] at 23.

The ALJ determined the effect of this limitation by posing a hypothetical RFC to the vocational expert that included this limitation. The vocational expert considered a claimant with the same age, education, and past relevant work as Plaintiff, and with the RFC as crafted by the ALJ, and concluded that such a claimant would be able to perform the requirements of representative occupations such as office helper, cafeteria attendant, and order caller. The ALJ supported his finding, and there is no basis for relief on this claim.

E.    Alleged Injudicious Interruptions

Plaintiff contends that the ALJ "abused his discretion and injudiciously interrupted and cut off" Plaintiff's counsel, Plaintiff, and the vocational expert and denied Plaintiff a full and fair hearing and due process of law. [21] at 4. Plaintiff posits that "this case should at least be remanded for a full, judicious Hearing [sic] before another ALJ." [21] at 4. Plaintiff quotes large sections of numerous cases for the proposition that a disability hearing should be conducted in a non-adversarial manner. *Id.* at 4, 10. But Plaintiff has not applied the quoted law to the facts. Plaintiff does not cite to any language by the ALJ during the hearing to evidence his alleged injudicious behavior. The only instance nearing a specific allegation on this issue is Plaintiff's assertion that the Plaintiff's "testimony [ECF 15, p. 50-61] was limited." Plaintiff makes this assertion and directs the Court to twelve pages of the hearing

transcript without further explanation regarding how Plaintiff's testimony was limited or how she believes it affected the outcome. Plaintiff has presented no evidence, nor is it evident from the record, that this case should be remanded because the ALJ was injudicious. *See Rasche v. Astrue*, No. 1:07 CV 081 A-A, 2008 WL 4151346, at *6-7 (N.D. Miss. Sept. 4, 2008).

## III.  <u>RECOMMENDATION</u>

It is recommended that Plaintiff's Motion for Summary Judgment [20] be denied and Plaintiff's Complaint dismissed with prejudice.

## IV.  <u>NOTICE OF RIGHT TO OBJECT</u>

Pursuant to Local Uniform Civil Rule 72(a)(3),

> After service of a copy of the magistrate judge's report and recommendations, each party has fourteen days to serve and file written objections to the report and recommendations. A party must file objections with the clerk of court and serve them upon the other parties and submit them to the assigned district judge. Within seven days of service of the objection, the opposing party or parties must either serve and file a response or notify the district judge that they do not intend to respond to the objection.

L.U.Civ.R. 72(a)(3); *see* 28 U.S.C. § 636(b)(1).

An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects. The District Judge need not consider frivolous, conclusive, or general objections. A party who fails to file written objections to the proposed findings, conclusions, and recommendations within fourteen (14) days of being served a copy shall be barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion adopted by the

Court to which he did not object. *Douglass v. United Servs. Auto. Assoc.,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

**SIGNED,** this the 4th day of February, 2022.

*s/ Robert H. Walker*

ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE